Ruth Hellen, Plaintiff-Appellant,

State of Wisconsin,
Department of Health Services,
Subrogated-Plaintiff,

v.

Rebecca Hellen, Jack Linney and
American Family Mutual Insurance Company,
Defendants-Respondents.

Court of Appeals

*No. 2012AP1916. Submitted on briefs February 11, 2013.
—Decided April 25, 2013.*

2013 WI App 69

(Also reported in 831 N.W.2d 430.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Alexander J. Smith* of *Alexander J. Smith Law Offices*, Beloit.

On behalf of the defendant-respondent, *Rebecca Hellen*, the cause was submitted on the brief of *Michael P. Crooks* of *Peterson, Johnson and Murray, S.C.*, Madison.

On behalf of the defendant-respondent, *Jack Linney*, the cause was submitted on the brief of *Barbara M.*

*Olivas* and *Karen M. Gallagher* of *Coyne, Schultz, Becker & Bauer, S.C.,* Madison.

On behalf of the defendant-respondent, American Family Mutual Insurance Company, the cause was submitted on the brief of *Patricia J. Epstein* and *Sheila M. Sullivan* of *Bell, Moore & Richter, S.C.,* Madison.

Before Sherman, Blanchard and Kloppenburg, JJ.

¶ 1. BLANCHARD, J. In this case, we are called upon to interpret and apply the equine immunity statute, WIS. STAT. § 895.481 (2011–12).[1] The basic facts are that Ruth Hellen was injured as a result of contact with a horse named Whisper as Ruth held Whisper's lead rope and Ruth's daughter-in-law, Rebecca Hellen, prepared to ride Whisper. The circuit court concluded on summary judgment that the equine immunity statute applies to bar Ruth's claims against Rebecca and Whisper's owner, Jack Linney. Ruth appeals the resulting order and a subsequent order denying her motion for reconsideration.

¶ 2. The statute grants immunity, subject to exceptions, to a person for his or her acts or omissions "related to his or her participation in equine activities if a person participating in the equine activity is injured . . . ." WIS. STAT. § 895.481(2). "Equine activity" is defined to include, among many other activities, "riding" an equine or "assisting" a rider. *See* § 895.481(1)(b)4., 5., and 9. However, immunity is not available for a person who "[p]rovides an equine to a person and fails to make a reasonable effort to determine the ability of the person to engage safely in an equine activity . . . ." § 895.481(3)(b).

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

¶ 3. Ruth argues that the circuit court erred in its interpretation and application of the statute in two respects. First, Ruth argues that the court incorrectly interpreted and applied the statute to conclude that, at the time of Ruth's accident, Rebecca was engaged in conduct "related to" Rebecca's participation in the equine activity of riding, so that statutory immunity would apply. Second, Ruth argues that the court incorrectly interpreted and applied the statute to conclude that Rebecca did not "provide" an equine to Ruth, so that the above statutory exception precluding immunity would not apply. We disagree with Ruth's first argument, but we agree with her second. We therefore reverse the circuit court's orders and remand for further proceedings, which will include an inquiry into whether Rebecca made a reasonable effort to determine Ruth's ability to engage safely in an equine activity.

## BACKGROUND

¶ 4. Rebecca regularly rode horses owned by Linney. On the day Ruth was injured, Ruth accompanied Rebecca to the farm where the horses were kept. As Rebecca prepared to ride Whisper, Rebecca asked Ruth if she wanted to hold Whisper's lead rope.[2] As Ruth held Whisper's lead rope, Rebecca began the process of saddling Whisper. As part of that process, Rebecca

---

[2] At points in the record, Rebecca refers to Ruth holding Whisper's reins, and not to her holding Whisper's lead rope or lead line. However, the parties appear in their briefing to agree that it was in fact Whisper's lead rope that Ruth held at the time of the accident. The distinction does not matter for purposes of our decision, and throughout this opinion we will refer to the item Ruth held as the lead rope.

proceeded to "blanket" Whisper.[3] Whisper apparently moved forward and stepped on one of Ruth's feet, causing Ruth to lose her balance and fall to the ground. Ruth suffered a fractured hip as a result.

¶ 5. Ruth brought a negligence claim against Rebecca, based in part on an allegation that Rebecca handled Whisper at the time of the accident in a manner that presented a danger to Ruth. In addition, Ruth brought a related claim against Linney, based on a theory of respondeat superior. Ruth also named Linney's insurer, American Family Insurance Company, as a defendant.

¶ 6. Rebecca moved for summary judgment based on the equine immunity statute. Ruth and Linney moved for summary judgment on the issue of respondeat superior. American Family moved for a declaratory judgment on the issue of insurance coverage.

¶ 7. The circuit court concluded that the equine immunity statute applies to bar Ruth's negligence claim against Rebecca. Based on that conclusion, the court further concluded that all other issues, including respondeat superior and coverage, are moot. Accordingly, the court granted summary judgment against Ruth and in favor of Rebecca, Linney, and American Family. As indicated above, Ruth appeals the resulting order and the subsequent order denying her motion for reconsideration.

## DISCUSSION

██ █

¶ 8. We review a grant of summary judgment de novo, applying the same standards as the circuit court.

---

[3] It is apparent from the record and briefing that to "blanket" in this context refers to placing a blanket on the back of a horse, to go underneath the saddle, as part of the saddling process that riders routinely follow before mounting a horse.

*Mettler v. Nellis*, 2005 WI App 73, ¶ 7, 280 Wis. 2d 753, 695 N.W.2d 861. We need not repeat all of those standards here. For current purposes, it is enough to say that summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. *See id.* Here, our decision does not turn on any factual dispute but on the proper interpretation and application of the equine immunity statute.

¶ 9. The interpretation and application of a statute is a question of law that we review de novo. *Barritt v. Lowe*, 2003 WI App 185, ¶ 6, 266 Wis. 2d 863, 669 N.W.2d 189. We construe statutory language based on its common and ordinary meaning. *Id.* If the language is plain and unambiguous, our analysis stops there. *Kangas v. Perry*, 2000 WI App 234, ¶ 8, 239 Wis. 2d 392, 620 N.W.2d 429. In conducting this analysis, we read statutory language not in isolation but as it relates to the statute as a whole. *Id.* In addition, we interpret statutes whenever possible to avoid unreasonable or absurd results. *Hines v. Resnick*, 2011 WI App 163, ¶ 12, 338 Wis. 2d 190, 807 N.W.2d 687.

¶ 10. The equine immunity statute provides, in pertinent part, as follows:

**Civil liability exemption; equine activities.**
**(1)** In this section:

. . . .

(b) "Equine activity" means any of the following:

1. Shows, fairs, competitions, performances or parades that involve any breeds of equines and any equine disciplines, including combined training, competitive trail riding, cutting, dressage, driving, endurance trail riding, English or western performance riding, grand prix jumping, horse racing, hunter and jumper shows,

hunting, polo, pulling, rodeos, 3–day events and western games.

2. Equine training or teaching.

3. Boarding of equines.

4. Riding, inspecting or evaluating an equine belonging to another, regardless of whether the owner of the equine receives monetary or other consideration for the use of the equine or permits the riding, inspection or evaluation of the equine.

5. Riding, training or driving an equine or being a passenger on an equine.

6. Riding, training or driving a vehicle pulled by an equine or being a passenger on a vehicle pulled by an equine.

7. Assisting in the medical treatment of an equine.

8. Shoeing of an equine.

9. Assisting a person participating in an activity listed in subds. 1. to 8.

. . . .

(g) "Spectator" means a person who attends or watches an equine activity but does not participate in the equine activity or perform any act or omission related to the equine activity that contributes to the injury or death of a participant in the equine activity.

(2) Except as provided in subs. (3) and (6), a person, including an equine activity sponsor or an equine professional, is immune from civil liability for acts or omissions related to his or her participation in equine activities if a person participating in the equine activity is injured or killed as the result of an inherent risk of equine activities.

(3) The immunity under sub. (2) does not apply if the person seeking immunity does any of the following:

. . . .

(b) Provides an equine to a person and fails to make a reasonable effort to determine the ability of the person to engage safely in an equine activity or to safely manage the particular equine provided based on the person's representations of his or her ability.

. . . .

(3m) A person whose only involvement in an equine activity is as a spectator shall not be considered to be participating in the equine activity.

WIS. STAT. § 895.481.

¶ 11. As indicated above, Ruth argues that the circuit court erred in its interpretation and application of the statute in two respects. First, Ruth argues that the court incorrectly interpreted and applied the statute to conclude that, at the time of the accident, Rebecca was engaged in conduct "related to" Rebecca's participation in the equine activity of riding. Second, Ruth argues that the court incorrectly interpreted and applied the statute to conclude that Rebecca did not "provide" an equine to Ruth. We address these arguments in turn. Because we agree with Ruth's second argument, we reverse and remand for further proceedings, which will include an inquiry into whether Rebecca made a reasonable effort to determine Ruth's ability to engage safely in an equine activity. Under the circumstances here, that inquiry will determine whether the exception precluding immunity contained in WIS. STAT. § 895.481(3)(b), referenced above, applies. In addition, as explained below, the court on remand will have the opportunity to address other remaining issues.

A. Conduct "Related to" Participation in Equine Activity

¶ 12. Ruth's first argument pertains to WIS. STAT. 895.481(2), the immunity-granting provision. As re-

flected above, § 895.481(2) provides, subject to exceptions, that a person, here Rebecca, is immune for acts or omissions "related to . . . her participation in equine activities if a person [here, Ruth] participating in the equine activity is injured or killed as the result of an inherent risk of equine activities." Ruth argues that the undisputed facts show that Rebecca's alleged acts and omissions were, in the terms of the statute, not "related to [Rebecca's] participation in equine activities" because they were not related to "riding" a horse, the equine activity at issue.

¶ 13. The circuit court concluded that the alleged negligent conduct of Rebecca, which included according to the complaint "handling the animal in a way that presented a danger to" Ruth, was related to Rebecca's participation in an equine activity because Rebecca was blanketing Whisper in preparation for riding at the time of the accident. The court reasoned that blanketing a horse in preparation to ride it is plainly "related to" riding the horse. We agree with the circuit court.[4]

¶ 14. Ruth does not dispute that Rebecca was blanketing Whisper in preparation to ride him at the time of the accident. Rather, Ruth's argument appears to be based on an interpretation of the statute under which a person asserting that he or she has immunity because he or she was "riding," as an "equine activity," at the time of the injury-producing accident must show that he or she was on the back of a horse at the moment of the accident. This interpretation is not supported by the text of the statute. As indicated above, the statute is worded in terms of immunity for acts or omissions

_____

[4] We need not, and do not, address whether Rebecca may have been participating in any additional "equine activity," as that term is defined in the statute.

232

"related to" participation in an equine activity, in this instance the activity of riding. The statute is not worded in terms of immunity only for the act of the activity itself.

¶ 15. Ruth argues that "related to" must be interpreted narrowly. Otherwise, she argues, all acts or omissions that in any way involve an equine will be immune from liability, and the legislature's detailed list of what constitutes an "equine activity" will be rendered meaningless. We will assume, without deciding, that Ruth is correct in contending that "related to" must be interpreted narrowly. We conclude, however, that even under a narrow reading of "related to," blanketing a horse in preparation to ride it is plainly related to participation in riding.

¶ 16. We find little guidance in Wisconsin's or other states' case law regarding the proper interpretation of "related to" in the Wisconsin statute. Moreover, we find from a review of language used in some equine immunity statutes adopted by some other states that the statutory language can vary considerably, reducing the value of much of the persuasive authority from other states with these statutes. That said, our conclusion appears to be at least consistent with the case law we have located. *See Barritt*, 266 Wis. 2d 863, ¶¶ 1, 3–5, 8 (parties agreed that defendant was engaged in equine activities of boarding *and training* even though it appeared that defendant's only training-related conduct was instructing plaintiff to retrieve plaintiff's horse from a pen); *Adams v. Hare*, 536 S.E.2d 284, 285–88 & n.3 (Ga. Ct. App. 2000) (trainer was a "participant" in an equine activity because she was preparing a horse to be ridden); *cf. Bothell v. Two Point Acres, Inc.*, 965 P.2d 47, 49–50, 54 (Ariz. Ct. App. 1998) (rider who had finished riding one

horse and was leading a different horse that she was not intending to ride was engaged in "non-riding activities").[5]

¶ 17. Ruth points to evidence that Whisper was never actually ridden on the day of the accident. Obviously, Ruth's injury intervened. If Ruth means to argue that the statute should be interpreted so that the absence of actual riding makes a difference, we disagree. First, as a logical matter, an act or omission may be "related to" participation in riding even when no riding occurs; any other approach would read the phrase "related to" out of the statute. Second, such an interpretation produces unreasonable and absurd results by making immunity depend on the fortuity of whether the injury-producing accident occurred before or after an act of riding. To illustrate, it would not be reasonable to interpret and apply the statute to conclude that Rebecca has no immunity here solely because she had yet to actually ride Whisper when the accident occurred, but would have had immunity if Ruth had been injured while holding Whisper's lead rope as Rebecca removed his blanket immediately *after* riding him.

¶ 18. For all of these reasons, we agree with the circuit court that Rebecca was engaged in conduct related to her participation in the equine activity of riding Whisper at the time of the accident.

■

¶ 19. Before proceeding to Ruth's second argument pertaining to the exception in WIS. STAT.

---

[5] We have located only three Wisconsin appellate cases, each from this court, addressing the equine immunity statute: *Mettler v. Nellis*, 2005 WI App 73, 280 Wis. 2d 753, 695 N.W.2d 861, *Barritt v. Lowe*, 2003 WI App 185, 266 Wis. 2d 863, 669 N.W.2d 189, and *Kangas v. Perry*, 2000 WI App 234, 239 Wis. 2d 392, 620 N.W.2d 429. Only *Barritt* provides guidance on the issues here, and as indicated above that guidance is limited.

§ 895.481(3)(b) of the statute, we pause to briefly address the other remaining requirements in the immunity-granting provision, § 895.481(2). Specifically, for Rebecca to receive immunity under § 895.481(2), Ruth needed to be (1) "participating" in an equine activity, and (2) injured "as the result of an inherent risk of equine activities." *See* § 895.481(2).

■

¶ 20. As to the first requirement, it appears to us that the circuit court, Ruth, Rebecca, Linney, and American Family all agree that, if Rebecca was engaged in conduct related to riding, then Ruth was participating in an equine activity because Ruth was, at the least, "assisting" Rebecca with riding.[6] We agree with the circuit court and parties on this point because, as indicated above, *"[a]ssisting* a person participating in an activity listed" is among the definitions of what constitutes an "equine activity." *See* WIS. STAT. § 895.481(1)(b)9. (emphasis added). As to the second requirement, Ruth concedes as she must on these facts that she was injured as the result of an inherent risk of equine activities.[7]

---

[6] Rebecca, Linney, and American Family have each filed separate response briefs. As to Ruth's briefing, we clarify that, as discussed in the text, Ruth does not agree that Rebecca was engaged in conduct related to participation in an equine activity, namely riding. Ruth does, however, agree that, if we conclude that Rebecca was engaged in conduct related to participation in riding, which we now have, then Ruth was at the least "assisting" Rebecca in that activity.

[7] WISCONSIN STAT. § 895.481(1)(e) provides the following definition for "inherent risk of equine activities":

> "Inherent risk of equine activities" means a danger or condition that is an integral part of equine activities, including all of the following:

### B. *"Provides" an Equine*

¶ 21. This brings us to Ruth's argument that the circuit court incorrectly interpreted and applied the equine immunity statute to conclude that Rebecca did not "provide" an equine to Ruth. As indicated above, WIS. STAT. § 895.481(3)(b) contains an exception to immunity that applies, as Ruth asserts it does here, when the party seeking immunity "[p]rovides an equine to a person and fails to make a reasonable effort to determine the ability of the person to engage safely in an equine activity . . . ." § 895.481(3)(b).[8]

¶ 22. In concluding that Rebecca did not "provide" Whisper to Ruth, the circuit court appeared to reason that Ruth could participate in an equine activity under

1. The propensity of an equine to behave in a way that may result in injury or death to a person on or near it.

2. The unpredictability of an equine's reaction to a sound, movement or unfamiliar object, person or animal.

3. A collision with an object or another animal.

4. The potential for a person participating in an equine activity to act in a negligent manner, to fail to control the equine or to not act within his or her ability.

[8] WISCONSIN STAT. § 895.481(3)(b) more fully states the inquiry to be whether the person providing the equine failed to make "a reasonable effort to determine the ability of the person [to whom the equine is provided] to engage safely in an equine activity or to safely manage the particular equine provided based on the person's representations of his or her ability." Thus, the statute speaks in terms of a reasonable effort to make two related but different determinations: the ability of the person provided with an equine to engage safely in an equine activity, and his or her ability to safely manage the particular equine provided. However, Ruth states in her briefing that she is not relying on the second type of determination.

Wis. Stat. § 895.481(1)(b) and (2) without first being "provided" an equine under § 895.481(3)(b). The court also appeared to reason that Rebecca did not "provide" Whisper to Ruth because Ruth was merely assisting Rebecca and because, according to Rebecca's deposition testimony, Rebecca did not need Ruth's assistance. As discussed further below, we conclude that Rebecca did "provide" Whisper to Ruth for purposes of § 895.481(3)(b).

¶ 23. This court has previously interpreted the meaning of "provides" in Wis. Stat. § 895.481(3)(b). Specifically, as pertinent here, we stated in *Barritt* that "provides" means "to make available for use an equine that the provider either owns or controls." *Barritt*, 266 Wis. 2d 863, ¶ 11.[9] Thus, under *Barritt*, a provider of an equine must have ownership or control of the equine and must make the equine available for use.

¶ 24. As far as we can discern, there is no dispute that Rebecca had sufficient control over Whisper to meet the definition of "provides." Rather, the dispute is limited to whether Rebecca made Whisper available for Ruth's use. *Barritt* contains no further insight into what it means to make an equine available for use, at least not as relevant to the arguments here.

¶ 25. We must interpret the term "provides," and consider the concept of "make[s] available for use," in the broader context of the statute. *See Kangas*, 239

---

[9] Our full statement of the definition of "provides" in *Barritt*, 266 Wis. 2d 863, ¶ 11, is as follows: " '[P]rovides an equine' as used in Wis. Stat. § 895.481(3)(b) means to make available for use an equine that the provider either owns or controls and does not encompass an equine previously sold or given to the individual claiming damages." Here, there is no question that neither Rebecca nor anyone else "sold" or "gave" Whisper to Ruth, which as contemplated by *Barritt* would have required evidence of a transfer of some form of ownership.

237

Wis. 2d 392, ¶ 8 (statutory language is interpreted not in isolation but in relation to the statute as a whole). It is this broader statutory context that leads us to conclude that Rebecca provided Whisper to Ruth, or, in the words of *Barritt*, made Whisper available for Ruth's use. In particular, we focus on the text of the exception to immunity in WIS. STAT. § 895.481(3)(b), on the list of what constitutes an "equine activity" under § 895.481(1)(b), and on the statute's treatment of "spectators" under § 895.481(1)(g), (2), and (3m).

¶ 26. As indicated above, WIS. STAT. § 895.481(3)(b) refers not only to whether the person seeking immunity "provides" an equine but also to whether that person makes "a reasonable effort to determine the ability of the person" to whom the equine is provided "to engage safely *in an equine activity.*" (Emphasis added.) This approach plainly contemplates that it must be possible under the statute for someone to "provide" an equine to someone else in connection with each of the many varieties of "equine activit[ies]." It would not matter whether the "equine activity" is participating in a "rodeo," "[r]iding . . . an equine," "training . . . an equine," "being a passenger [as opposed to a rider] on an equine," "being a passenger on a vehicle pulled by an equine," or "assisting" another person in any such activity, *see* § 895.481(1)(b)—in each instance, "providing" must be possible. Otherwise, the legislature would have specified in some manner in § 895.481(3)(b) that only a subset of equine activities is subject to the exception.

¶ 27. Based on this statutory context, we disagree with the circuit court's apparent reasoning that Ruth, who did not own or control Whisper before the accident, could participate in any equine activity involving Whisper, including "assisting," without being "provide[d]"

238

with Whisper within the meaning of the statute. That is, while it is true that a person who already owns or controls an equine can participate in an equine activity without being provided with an equine, Ruth was not such a person. Therefore, in order for Ruth to participate in an equine activity, someone must have provided Ruth with an equine, or, in the words of *Barritt*, made an equine available for Ruth's use. Here, that use was, at a minimum, assisting Rebecca with Rebecca's participation in riding.

¶ 28. Our interpretation and application of the statute in this manner is further supported by the statute's treatment of "spectators," who are defined in the statute as persons who attend or watch an equine activity, but who do not participate in the equine activity (or perform any acts or omissions related to the activity that contributes to an injury). *See* WIS. STAT. § 895.481(1)(g) and (3m). There is no immunity under the statute for a person's acts or omissions causing injury to a spectator. *See* § 895.481(1)(g), (2), and (3m). The statute thus places a logical limitation on what it means to provide an equine, or, in the words of *Barritt*, what it means to make an equine available for use, because the statute plainly does not contemplate that an equine may be provided to a mere spectator. Rather, as we have indicated, providing an equine entails making that equine available for use in an equine activity.

¶ 29. Applying our interpretation to the undisputed facts here, we conclude that Rebecca provided Whisper to Ruth by allowing Ruth to hold Whisper's lead rope while Rebecca blanketed Whisper in preparation for riding. Stated in terms that match both the logic of the statutory language and *Barritt*, Rebecca made Whisper available for Ruth's use in participating in the equine

activity of assisting Rebecca's participation in riding Whisper.

¶ 30. Rebecca argues that she could not have provided Whisper to Ruth because Rebecca remained in sole control of Whisper and never transferred any control to Ruth. In making this argument, Rebecca apparently views it as an undisputed fact that she retained sole control of Whisper. She relies on her deposition testimony, including testimony that: it was unnecessary for someone to hold Whisper's lead rope while Rebecca blanketed him; Whisper would have "just stood there" if Ruth had not been holding the lead rope; and Rebecca allowed Ruth to hold the lead rope only so that Ruth could pet Whisper or "feel useful." Rebecca does not address whether it might be reasonable to infer that she transferred at least partial control of Whisper to Ruth, putting Ruth and Rebecca in joint control of Whisper.

¶ 31. However, we will assume, without deciding, that Rebecca retained sole or primary control of Whisper. Regardless, we are not persuaded by Rebecca's control argument, for much the same reason that we are not persuaded by the circuit court's rationale. As we have said, the statute contemplates that an equine may be provided for any and all of the defined equine activities. Some of those activities, as listed above, would not ordinarily involve the transfer of full control, or perhaps any control, of the equine. If we interpreted the statute to make a transfer of full or partial control the dispositive factor, we would in effect be reading at least some of the defined equine activities out of the statute. In addition, we find it difficult to square Rebecca's control argument with *Barritt*'s interpretation of the statute to require only that the person owning or controlling the equine make that equine

"available for use." We therefore conclude that it is immaterial whether Rebecca retained sole or primary control of Whisper.[10]

¶ 32. For all of the reasons stated above, we agree with Ruth that Rebecca provided Whisper to Ruth for purposes of the exception to immunity in Wis. STAT. § 895.481(3)(b).

### C. Remand for Further Proceedings

¶ 33. Given our conclusion that Rebecca provided Whisper to Ruth, and given Ruth's concession that she is not arguing that Rebecca failed to make a reasonable effort to determine that Ruth could "safely manage" Whisper, see Wis. STAT. § 895.481(3)(b), the applicability of the exception in § 895.481(3)(b) turns on the question of whether Rebecca failed to make "a reasonable effort to determine the ability of [Ruth] to engage safely in an equine activity." *See id.* The circuit court did not reach this question in its summary judgment decision, and, although the parties reference at least some relevant evidence in their briefing, they have not developed arguments on this question in this appeal. Therefore, we conclude that the better course is to leave this question for resolution in the circuit court on remand. Accordingly, we reverse and remand for further proceedings that will include an inquiry into whether Rebecca made the requisite "reasonable effort."

---

[10] If the issue of whether Rebecca retained sole or primary control of Whisper were material, we would question whether Rebecca's control argument could be resolved on summary judgment. Rather, it appears that there is at least a reasonable inference that Rebecca relinquished to Ruth or shared with Ruth at least some control over Whisper when Rebecca asked Ruth to hold Whisper's lead rope and Ruth accepted this invitation.

¶ 34. In addition, the circuit court on remand will have the opportunity to address other issues it did not reach and deemed "moot," including the issues of respondeat superior and coverage under Linney's insurance policy with American Family. The parties have not briefed the issue of respondeat superior in this appeal. As to the issue of coverage, while American Family has briefed this issue, it fails to develop any argument showing that the issue is properly before this court at this time. American Family fails to point to anything in the record showing that the circuit court acted on its motion for declaratory judgment on this issue or that it objected to the court's ruling that the coverage issue was moot given the court's interpretation of the equine immunity statute.

## CONCLUSION

¶ 35. In sum, for the reasons stated, we reverse the circuit court's orders and remand for further proceedings consistent with our decision.

*By the Court.*—Orders reversed and cause remanded for further proceedings.